NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 12

No. 23-AP-127

| | |
|---|---|
| Housing Our Seniors in Vermont Inc. et al. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Orleans Unit, Civil Division |
| | |
| Agency of Commerce & Community Development et al. | January Term, 2024 |

Daniel Richardson, J.

Harold B. Stevens of Stevens Law Office, Stowe, for Plaintiffs-Appellants.

Charity R. Clark, Attorney General, and David R. McLean,[1] Assistant Attorney General, Montpelier, for Defendant-Appellee State of Vermont.

David W. Rugh and Beriah C. Smith of Stitzel, Page & Fletcher, P.C., Burlington, for Defendant-Appellee City of Newport.

Daniel R. Long of Paul Frank + Collins P.C., Burlington, for Defendant-Appellee Northeastern Vermont Development Association.

Peter G. Raymond of Sheehey Furlong & Behm P.C., Burlington, for Defendant-Appellee Northern Community Investment Corporation.

PRESENT: Reiber, C.J., Eaton, Carroll and Cohen, JJ., and Grearson, Supr. J. (Ret.), Specially Assigned

¶ 1. **REIBER, C.J.** Plaintiffs, Housing Our Seniors in Vermont, Inc. and Lakemont Retirement Community, LLC, bring this appeal challenging the superior court's dismissal of their

---

[1] Eleanor L.P. Spottswood, Solicitor General, and Nicholas Martin, Legal Intern, were on the brief. David R. McLean substituted as counsel.

complaint for failure to state a claim upon which relief can be granted. In their complaint, plaintiffs seek an order declaring that a grant given by the Newport Development Fund Grant Committee to the Northeast Kingdom Development Corporation (NEKDC) was improperly awarded. The court held that plaintiffs lacked standing to challenge the award because the grant program was not a formal bidding process governed by legally enforceable standards. We affirm.

## I. Facts

¶ 2. The grant program at issue here was established by the State of Vermont in the wake of the EB-5 scandal. The scandal involved multiple individuals in northeastern Vermont who solicited international investments through the federal EB-5 immigration program. The individuals falsely claimed that the funds would be used for certain development projects in and around the City of Newport, but they instead misappropriated most of the funds for personal gain. Through a consent order and a settlement agreement with two of the EB-5 defendants, the State established a fund maintained by the Agency of Commerce and Community Development (ACCD), "to be used for economic development in Newport."[2] To distribute the settlement funds, the ACCD established the Newport Development Fund Grant Committee, consisting of representatives from the Vermont Department of Housing and Community Development (DHCD), the Vermont Department of Economic Development (DED), the City of Newport, and the Northeastern Vermont Development Association (NVDA), as well as an alternate representative from the Northern Community Investment Corporation (NCIC).

¶ 3. Plaintiffs alleged in their complaint that they applied to the Committee for a $750,000 grant to assist with a senior housing development project in Newport. In their

---

[2] See Consent Order, State v. Quiros, No. 217-4-16 Wncv (Vt. Dist. Ct. Aug. 7, 2018), https://eb5.vermont.gov/sites/ebfive/files/documents/quiros-consent-order-settlement-080718.pdf [https://perma.cc/SU27-HC4B]; Settlement Agreement, State v. Quiros, No. 217-4-16 Wncv (Vt. Dist. Ct. July 11, 2018), https://ago.vermont.gov/sites/ago/files/wp-content/uploads/2018/07/Stenger-Executed-Settlement-Agreement.pdf [https://perma.cc/6SLP-84L9].

application, plaintiffs detailed the proposed development, their capacity to complete the project, and the project's benefits to Newport, and they asserted that they had been adversely impacted by the EB-5 scandal in soliciting investments. However, when the Committee announced the recipients of the grants in early 2022, plaintiffs were not among the beneficiaries. The largest grant award—$1,029,000—was given to NEKDC.

¶ 4. Plaintiffs brought this suit in December 2022 against a host of defendants—ACCD, DHCD, NCIC, the City of Newport, NVDA, and NEKDC—alleging that NEKDC should not have been awarded the grant because it was not a Newport business and it had not demonstrated a realistic plan for job creation or retention. Plaintiffs suggested that shovel-ready projects and projects adversely affected by the EB-5 scandal should have been prioritized and they alleged that NEKDC met neither criterion. Plaintiffs further alleged that there was a conflict of interest on the Committee because one member of the Committee was an agent of both NVDA and NEKDC. As relief, plaintiffs asked the court to declare that the grant should not have been awarded to NEKDC, to require NEKDC to disgorge the grant funds, and to order the Committee to reconsider plaintiffs' application.

¶ 5. In response, defendants separately filed various motions with the court, including motions for a more definite statement under Vermont Rule of Civil Procedure 12(e), motions to dismiss for failure to state a claim under Vermont Rule of Civil Procedure 12(b)(6), and motions to dismiss for lack of subject matter jurisdiction under Vermont Rule of Civil Procedure 12(b)(1).

¶ 6. In March 2023, the court dismissed the case in its entirety. Analogizing to our holding in Franklin County Sheriff's Office v. St. Albans City Police Department, 2012 VT 62, 192 Vt. 188, 58 A.3d 207, the court determined that plaintiffs' status as unsuccessful grant applicants did not create standing to challenge the grant award because the grant program was "not a formal bidding process" governed by legally binding rules or statutes. Because plaintiffs did not "allege that they should have received the grant, or that there were such rules or binding terms to

3

the grant process that would have given rise to a right or legal expectation," they were "no differently situated than any other person or entity." Citing this "fundamental flaw in the complaint," the court determined that dismissal, rather than leave to amend, was appropriate.

¶ 7. Plaintiffs appealed, claiming that the court erred in dismissing the complaint because there were specific rules governing the grant process and they therefore suffered a legally cognizable injury. They argue that the case is justiciable because the eligibility criteria in the Newport Development Fund Letter of Intent created specific rules for the application process, which the Committee failed to follow. They also argue that they have a legally protectable interest because they were in the "zone of interest" by virtue of being grant applicants.

## II. Standard and Scope of Review

¶ 8. As an initial matter, there is some confusion in the court's order as to whether the dismissal operated under Vermont Rule of Civil Procedure 12(b)(1) or 12(b)(6). Rule 12(b)(1) allows a court to dismiss an action for lack of subject matter jurisdiction, including lack of standing, while Rule 12(b)(6) allows dismissal for failure to state a claim upon which relief can be granted. Defendants brought motions to dismiss under both rules, and their appellate briefs argue in the alternative for dismissal under both standards. Similarly, while the court's order appears to invoke Rule 12(b)(6), stating that "[t]he present action is dismissed under V.R.C.P. 12(b) for failure to state a claim upon which relief can be granted," its reasoning is grounded in the conclusion that plaintiffs lack standing.

¶ 9. This confusion is perhaps to be expected since "the difference between the two motions may often be difficult to discern." 5B C. Wright et al., Federal Prac. & Proc. (Wright & Miller) § 1350 (3d ed. 2023). However, "a motion under Rule 12(b)(1) [should not] be confused with a motion under Rule 12(b)(6) . . . because the two are analytically different" in that "the former determines whether the plaintiff has a right to be in the particular court and the latter is an adjudication as to whether a cognizable legal claim has been stated." Id.

4

¶ 10. Given that the court's reasoning and the majority of the parties' briefing focuses on the issue of standing, we will treat the court's dismissal as operating under Rule 12(b)(1). Because, for reasons discussed below, we affirm dismissal on standing grounds, we need not consider whether plaintiffs have stated a claim upon which relief can be granted.[3] To the extent that our holding is on different grounds than the trial court's, we note that our precedents permit us to affirm a lower court's decision "if the record before us discloses any legal ground which would justify the result." In re Handy, 171 Vt. 336, 343, 764 A.2d 1226, 1234 (2000) (quotation omitted). We note also that "our standard of review is the same" in reviewing dismissals under Rules 12(b)(1) and 12(b)(6). Vt. State Auditor v. OneCare Accountable Care Org., LLC, 2022 VT 29, ¶ 9 n.1, 216 Vt. 478, 280 A.3d 377.

¶ 11. Our review of a dismissal for lack of subject matter jurisdiction is de novo. Rheaume v. Pallito, 2011 VT 72, ¶ 2, 190 Vt. 245, 30 A.3d 1263. We "assume as true the nonmoving party's factual allegations and accept all reasonable inferences that may be drawn from those facts." Wool v. Off. of Prof. Regul., 2020 VT 44, ¶ 8, 212 Vt. 305, 326 A.3d 1250 (quotation omitted). We will not dismiss a complaint on these grounds "unless it appears beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." Murray v. City of Burlington, 2012 VT 11, ¶ 2, 191 Vt. 597, 44 A.3d 162 (mem.) (quotation omitted).

### III.  Standing

¶ 12. Standing is a constitutional doctrine, grounded in the Article III limitation of federal-court jurisdiction to actual cases and controversies. See U.S. Const. art. III, § 2, cl. 1. While the Vermont Constitution lacks equivalent language, we have adopted federal standing requirements, stating that "[t]he judicial power, as conferred by the Constitution of this State upon this Court, is the same as that given to the Federal Supreme Court by the United States

---

[3] For the same reason, we also need not address City of Newport's argument that it was not a proper party to the dispute.

Constitution; that is, the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction." In re Constitutionality of House Bill 88, 115 Vt. 524, 529, 64 A.2d 169, 172 (1949) (quotations omitted).

¶ 13. To establish standing, plaintiffs must "at an irreducible minimum demonstrate the following constitutional elements: (1) injury in fact, (2) causation, and (3) redressability." Hinesburg Sand & Gravel Co. v. State, 166 Vt. 337, 341, 693 A.2d 1045, 1048 (1997). Plaintiffs must allege sufficient facts to establish standing "[o]n the face of the complaint." Town of Cavendish v. Vt. Pub. Power Supply Auth., 141 Vt. 144, 147-48, 446 A.2d 792, 794 (1982). These requirements apply equally in an action seeking declaratory relief. Id. at 147, 446 A.2d at 794.

¶ 14. To satisfy this initial burden, a plaintiff must demonstrate that there is "an actual controversy between the parties." Id. "Otherwise, the judgment would be no more than an advisory opinion, which we lack the constitutional power to render." Parker v. Town of Milton, 169 Vt. 74, 77, 726 A.2d 477, 480 (1998). The existence of an actual controversy "turns on whether the plaintiff is suffering the threat of actual injury to a protected legal interest, or is merely speculating about the impact of some generalized grievance." Town of Cavendish, 141 Vt. at 147, 446 A.2d at 794.

¶ 15. We conclude that plaintiffs lack standing because they have not alleged an actual injury to any protected legal interest. Because plaintiffs have no legal right to receive the grant funds or to have any specific procedure in the allocation of the grant funds, they have not alleged a sufficient injury-in-fact.

¶ 16. As an initial matter, plaintiffs have no legal right to receive a grant from the Committee. By their nature, grant programs involve limited disbursals of money and must pick some recipients over others. Plaintiffs cite no statutory, contractual, common law, constitutional, or other legal provisions that would entitle them to receive any of these grant funds. Nor have plaintiffs previously received grants from this program in a manner that might establish an

6

expectation or some threat of reputational injury. See <u>S. Mut. Help Ass'n v. Califano</u>, 574 F.2d 518, 525 (D.C. Cir. 1977) (distinguishing "a grantee engaged in an existing relationship," with "an applicant initially seeking a government grant" whose "application denial will have little, if any, effect on its good name and reputation"). Given that plaintiffs have not alleged any legal entitlement to a portion of the funds, the failure to receive a grant does not establish an injury-in-fact. See <u>St. Louis Cnty. v. State</u>, 424 S.W.3d 450, 453 (Mo. 2014) (holding grant applicants lacked standing to challenge constitutionality of awards because "grants from the fund are discretionary expenditures" and plaintiffs lacked "any right to a grant of money from the fund").

¶ 17. Nor do plaintiffs have any procedural rights with respect to the grant award process. As the court below held, our decision in <u>Franklin County Sheriff's Office</u>, 2012 VT 62, is controlling on this point. There, we considered whether a sheriff's office had standing to challenge a town's award of a public-law-enforcement contract to another agency and concluded that the office did not have standing because it had "no legally protected right to fair competition with other statutorily created government entities." <u>Id</u>. ¶ 15 (quotation omitted). We noted that the applicable statutory provision did not mandate a bidding process and that it provided only that towns "may" enter into agreements for law-enforcement services. <u>Id</u>. Because the process was discretionary, we determined that "the Town was under no obligation to entertain bids for police services in the first instance, or to award the contract to the lowest bidder." <u>Id</u>. ¶ 16.

¶ 18. The grant application process here provides an even greater degree of discretion than the bidding process in <u>Franklin County Sheriff's Office</u>. The grant program was not created by statute and no existing statutes govern the program. Instead, the program was created by a consent order and settlement agreement; thus, as the court identified, these are "[t]he controlling documents at issue." The consent order required only that the proceeds from a forced sale of certain fraudulently acquired properties be used "to promote economic development in the Northeast Kingdom." See Consent Order, <u>supra</u> note 2. The settlement agreement stated that

7

contributions would be made "to a fund maintained by the Agency of Commerce and Community Development, to be used for economic development in Newport, Vermont." See Settlement Agreement, supra note 2. Outside of these general statements, the documents made no specific representations on how the settlement funds would be used. Thus, provided the funds were used for economic development in Newport, the ACCD had total discretion under the controlling documents to choose grant recipients "in [its] own manner." Franklin County Sheriff's Office, 2012 VT 62, ¶ 15.

¶ 19. Nor does the mere existence of a grant application process that solicits applications entitle plaintiffs to any specific procedural rights in the awarding of the grants. In Franklin County Sheriff's Office, we reversed the trial court's conclusion that the sheriff's office was entitled to a "fair procurement process" simply because the town put the contract up for bid. Id. ¶ 17. We concluded that absent any statutory rights, the existence of the bidding process by itself was insufficient to establish a legally protectable interest. Id. The same is true here; the mere fact that the Committee established a grant application process did not automatically entitle plaintiffs to a fair adjudication process. Absent any controlling statutes, plaintiffs had no right to any specific procedure in the grant application process and therefore have not suffered an "actual injury to a protected legal interest." Town of Cavendish, 141 Vt. at 147, 446 A.2d at 794; see Donaldson v. United States, 86 Fed. App'x 902, 903 (6th Cir. 2004) (concluding that plaintiff lacked standing to enjoin USDA from awarding grants to other applicants because he had not established "that he had a personal interest at stake").

¶ 20. Plaintiffs point to the Committee's Letter of Intent to suggest that legally enforceable standards do exist here. The Letter of Intent, which accompanied the grant application, lists several eligibility criteria, including that applicants must operate within the City of Newport and must demonstrate realistic job creation. But the eligibility criteria provide no guarantee of any particular process. Nowhere do they state that all applications would be equally considered or that

8

applications that failed to meet the criteria would necessarily be rejected. More fundamentally, the Letter of Intent's eligibility criteria are not externally enforceable legal rights, but rather internal filtering mechanisms to assist the ACCD in the exercise of its broad discretion.

¶ 21. Allowing plaintiffs to challenge the ACCD's adherence to these criteria would infringe on executive branch discretion. See Hinesburg Sand & Gravel Co., 166 Vt. at 341, 693 A.2d at 1048 ("Standing doctrine is fundamentally rooted in respect for the separation of powers of the independent branches of government."). The only legal documents here—the settlement agreement and consent order—set out the ACCD's broad discretion in disbursing the settlement funds and otherwise provide no criteria on which to judge plaintiffs' claims that they were injured by this process. Fundamental to constitutional separation of powers is the idea that "[t]he province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion." Marbury v. Madison, 5 U.S. 137, 170 (1803). Thus, absent concrete injury to plaintiffs' individual rights, we cannot hear their claims regarding an issue of executive agency discretion. See A. Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk Univ. L. Rev. 881, 894-95 (1983) (describing "concrete injury" as "the indispensable prerequisite of standing," and stating that absent concrete injury, "there is no reason to remove the matter from the political process and place it in the courts").

¶ 22. Our decision does not mean that no party could challenge a grant award in this context. A plaintiff alleging a deprivation of a personal legal right—for example, a racial discrimination claim—would still have standing to challenge a grant award. But plaintiffs' theory of standing is too broad in that it would require us to recognize standing for any aggrieved grant applicant, even absent any allegations of a violation of a personal legal right.

¶ 23. Because we conclude that plaintiffs have not alleged an injury in fact, we need not decide whether they have met the other elements of constitutional standing. Similarly, we need

not address plaintiffs' arguments about the "zone of interest."[4] And because plaintiffs did not raise any argument about competitor standing, either below or in their appellate briefing, we need not consider that issue.

¶ 24. We conclude that plaintiffs lack standing because they have not alleged a violation of any individual legal right. Given the discretionary nature of the grant program, plaintiffs had no entitlement either to the grant funds or to due process in the awarding of the grant funds. Accordingly, we affirm the trial court's dismissal for lack of standing.

Affirmed.

FOR THE COURT:

_____

Chief Justice

---

[4] The zone-of-interest test is one of several "prudential elements of standing," which operate as "self-imposed judicial limits." See Hinesburg Sand & Gravel Co., 166 Vt. at 341, 693 A.2d at 1048. Prudential standing requirements apply on top of the three-part constitutional standing test and do not supply an alternative route to standing.